UNITED STATES ex rel. J. B. KLEIN IRON & FOUNDRY CO. v. JAMES Mc-HUGH SONS, Inc., et al. (CRANE CO., Intervener).

No. 5848.

District Court, W. D. Oklahoma.

Nov. 11, 1937.

Shirk, Danner & Earnheart, of Oklahoma City, Okl., for plaintiff.

Hal Crouch and Philip N. Landa, both of Tulsa, Okl., for defendant James McHugh Sons, Inc.

Thomas H. Owen, of Oklahoma City, Okl., for defendant surety companies.

Wilcox & Swank, of Stillwater, Okl., for defendant H. W. Thompson.

Shirk, Danner & Earnheart, of Oklahoma City, Okl., for intervener.

VAUGHT, District Judge.

This cause was tried upon the petition of Crane Company, intervener, as against H. W. Thompson, sole trader under the name of H. W. Thompson Heating & Engineering Company, and the defendant surety companies on the original bond executed in favor of the United States of America, guaranteeing the contract between the United States of America and James McHugh Sons, Inc., as general contractors, for the balance due to Crane Company for material furnished to Thompson, as subcontractor under James McHugh Sons, Inc.

On or about December 1, 1933, James McHugh Sons, Inc., general contractors, entered into a contract with the United States of America for the construction of eighteen four-family apartment houses at Fort Sill, Okl., for a consideration of $612,-000, and, at the same time, the said James McHugh Sons, Inc., executed a bond in favor of the United States of America guaranteeing prompt payment to all persons supplying labor and materials and for the faithful performance of its contract in the construction of said buildings. Said bond was executed by the New Amsterdam Casualty Company, Hartford Accident & Indemnity Company, the Fidelity & Casualty Company of New York, and the United States Fidelity & Guaranty Company, defendants herein.

On or about the 7th day of December, 1933, the general contractor, James McHugh Sons, Inc., entered into a subcontract with H. W. Thompson, doing business as H. W. Thompson Heating & Engineering Company, Stillwater, Okl., whereby Thompson agreed to furnish all materials and perform all labor for the construction of the plumbing, gas fitting, and steam-heating parts of the eighteen four-family apartment houses.

Prior to the execution of said contract by Thompson, Thompson had submitted a bid to the general contractor for the furnishing of all materials and performing all labor for the construction of the plumbing, gas fitting, and steam heating parts in said building for the sum of $94,000. Thompson was advised by the general contractor, soon after submitting said bid, that if he could make proper bond, the contract would be awarded him. Thompson, not being in such financial condition as to justify a surety company in making his bond, had difficulty in making bond and after conferring with

Crane Company, at its branch office in Oklahoma City, and with representatives of the surety companies in Oklahoma City, he advised C. L. Legg, the manager of the branch of Crane Company at Oklahoma City, that he could make the bond provided Crane Company would furnish the material and look to Thompson alone for the payment therefor, and execute a release, accordingly, to the surety company. Legg, as manager of Crane Company's branch at Oklahoma City, advised Thompson that they had better go to Chicago and take the matter up with the head office and with the general contractor in Chicago. Whereupon, Legg took Thompson in Legg's car to Chicago and Legg and Thompson conferred with various surety companies and Legg conferred with the officers of his company. Thereafter, Crane Company, by C. L. Legg, executed a waiver in the following words and figures, to wit:

"Chicago, Illinois,
"December 7, 1933
"United States Fidelity and Guaranty Co.,
"Baltimore, Maryland.

"Gentlemen: In consideration of your becoming surety on the bond of H. W. Thompson, as H. W. Thompson Heating and Engineering Company, of Stillwater, Oklahoma, in the amount of $97,700, in favor of James McHugh and Son, of Chicago, said bond covering the faithful performance on the part of H. W. Thompson as H. W. Thompson Heating and Engineering Company of its contract, dated December 7, 1933, with James McHugh and Son for furnishing all labor and material and performing all work required for the installation of plumbing and heating on the contract at Fort Sill, Oklahoma, for the construction of Eighteen Four-Family apartments, we hereby agree to furnish all material required on this contract until the contract is completed and accepted and not to look to your bond for payment for said material, provided further that we agree not to take over 90% of monies due us until contract is completed and accepted by James McHugh and Son.

"Yours very truly,
"Crane Co.,
"By [Signed] C. L. Legg."

After the execution of said waiver, United States Fidelity & Guaranty Company executed Thompson's bond. Thompson in the meantime, however, having revised his figures, submitted a supplemental bid in the sum of $97,700, which was the sum included in the contract between Thompson and the general contractor and in the bond with the United States Fidelity & Guaranty Company.

Thompson, prior to his trip to Chicago and the execution of his contract with the general contractor, had been to Crane Company's office, frequently, in Oklahoma City, had made a take-off from the plans and specifications of the amount and quality of material necessary to complete said buildings at Fort Sill and Crane Company, through its branch office at Oklahoma City, had quoted prices on said material, and Thompson submitted his bid to the general contractor based upon the quotations submitted to him by Crane Company.

Thompson entered upon his work at Fort Sill and on or about February 24, 1934, when the first estimate in favor of Thompson was due, the general contractor, in view of the fact that Crane Company had released its bond by the waiver hereinbefore set out, wrote Thompson a letter inclosing a check for $10,630, as payment of the January estimate stating that it would be necessary for them to have a waiver from Crane Company, which letter is as follows:

"February 24, 1934.
"Re: 18 Four Family Apts. Fort
Sill, Oklahoma.
"H. W. Thompson Heating & Engineering
Company,
"Stillwater,
"Oklahoma.
"Gentlemen:

"We are enclosing our check #7293 in the amount of $10,630.00 as a payment on your January estimate covering the plumbing and heating work on the above mentioned project. We were compelled to withhold your payment until we received your waiver from the Oklahoma Office of Crane Company.

"The release of Crane Company dated February 15 does not meet with our approval, as the form used is a waiver of lien used on private enterprises, but does not hold good on government work. It is our request, therefore, that you again contact the Crane Company office and have them prepare a release as follows:

"We, the Crane Company of 705 West Main Street, Oklahoma City, Oklahoma, will hold the H. W. Thompson Heating & Engineering Company of Stillwater, Oklahoma, duly responsible for the payment of all plumbing and heating material furnished on the 18 Four Family Apartments now

being erected at Fort Sill, Oklahoma. Further, in the event the H. W. Thompson Heating & Engineering Company default in the payment of their account to us, we will not hold James McHugh Sons, Inc., General Contractors, of 6449 South Park Avenue, Chicago, Ill., responsible for the payment of our account. This release embodies all the materials to be furnished by us in connection with this contract.

"The above form of release must be signed by a duly authorized representative of the Crane Company and should be attested to by a Notary Public. Would request you to send us this release at the earliest possible date, obliging

"Very truly yours,
"CJB/b      James McHugh Sons, Inc.
"Encl.              Per ——————."

Whereupon, on the 1st day of March, 1934, Crane Company, by C. L. Legg, as manager, wrote a letter to James McHugh Sons, Inc., Chicago, as follows:

"March 1, 1934.
"James McHugh Sons, Inc.,
"6449 South Park Ave.,
"Chicago, Ill.

"Gentlemen: We, Crane Co., of 705 West Main Street, Oklahoma City, Oklahoma, will hold the H. W. Thompson Heating & Engineering Company of Stillwater, Oklahoma, duly responsible for the payment of all plumbing and heating material furnished on the eighteen (18) Four Family Apartments now being erected at Fort Sill, Okla.

"Further, in the event the H. W. Thompson Heating & Engineering Company default in the payment of their account to us, we will not hold James McHugh Sons, Inc., General Contractors of 6449 South Park Avenue, Chicago, Ill., responsible for the payment of our account.

"This release embodies all the material to be furnished by us in connection with this contract.

"Crane Co.,
"CLL:AS—1      By C. L. Legg, Manager."

Thereafter, the work progressed, Thompson receiving his payments as his estimates became due and payable from the general contractor, and making payments from time to time to Crane Company. The work was finally completed, the general contractor paid to Thompson the sum due under its contract, and Thompson, after the completion of said contract, was indebted to Crane Company for material in the sum of $28,697.06, according to Crane

Company's contention. Thompson denies that he is indebted to Crane Company in this amount, or in any other amount, contending that Crane Company entered into this contract with him as a coadventurer, and that he and Crane Company were partners in the undertaking. He alleges that he paid $45,130.47 to Crane Company. According to the record, the difference between the amount paid by Thompson to Crane Company and the cost of the material furnished by Crane Company to Thompson would be the sum of $28,697.06, less a claimed credit by Thompson of approximately $7,000.

There is no denial of the execution of the waivers above set out, by Crane Company, but Crane Company contends that those waivers were executed by C. L. Legg, as manager of the Oklahoma City office, who had no authority to execute said waivers, or bind Crane Company whatever, and that it is entitled to judgment against James McHugh Sons, Inc., and its guarantors, under the original bond to the government, for the balance due as herein stated, resulting from the difference between the value of the material furnished by Crane Company to Thompson and the amount paid by Thompson to Crane Company.

The first question for consideration will be whether or not Crane Company is entitled to relief against the bond of the general contractor, and this involves whether or not Crane Company was bound by the waivers executed by C. L. Legg, as manager of the Oklahoma City office.

Legg testified that he had been connected with Crane Company for more than thirty-five years, and that he had been connected with the Oklahoma City branch for eighteen years and had been the manager of the Oklahoma City branch for nine and a half years.

The evidence in this case discloses the fact that Mr. Legg, as manager, was very anxious to secure this contract for Thompson; that he was assured that, if Thompson received the contract from the general contractor, Crane Company would be able to furnish the material to Thompson necessary to carry out Thompson's contract. Crane Company had known Thompson for some five years, had furnished him material from time to time, and knew his financial condition. When it was apparent to Legg, as manager of the Oklahoma City branch of Crane Company, that Thompson was not able to secure a surety bond ac-

ceptable to the general contractor, Legg realized that some concession would be required in order to help Thompson to secure the contract. The proposition was submitted to Legg that, if Crane Company would waive any claim against the general contractor and agree to look to Thompson alone for the payment of its bills, a surety bond could be provided which would be acceptable to the general contractor.

With this under consideration, Legg went to Chicago taking Thompson with him, and they advised with various surety companies in Chicago. While in Chicago, Legg advised with the officers of Crane Company and later he executed the waiver of December 7, 1933, to the United States Fidelity & Guaranty Company, which company signed the bond for Thompson. Later, Legg, when the first estimate was due to Thompson on his contract, signed a waiver to James McHugh Sons, Inc., general contractor.

It is hard to conceive how, under the circumstances, Legg would have signed so important documents without the authority of the corporation by which he was employed. He had been connected with this corporation for thirty-five years, had been in the Oklahoma City branch office for eighteen years, and for nine and a half years he had been the manager of the Oklahoma City branch. The purposes and functions of a manager are to do all those things which are necessary to be done to sell and distribute merchandise and to make contracts therefor, and it is not probable that Legg would have signed these documents without first having advised with his home office relative thereto. If Legg did not have authority, then the company is certainly subject to censure.

When these waivers were executed, the general contractor had a right to assume that, if Thompson failed to pay Crane Company for the material that he purchased for said contract, Crane Company would look to Thompson for said payment and not to the general contractor.

Crane Company does not contend that Thompson's bondsman is liable because of the execution of the bond in favor of Thompson but contends that, under the general bond required by federal statute to be executed by the general contractor for the protection of subcontractors' material and labor (40 U.S.C.A. § 270), it is entitled to recover.

In National Surety Co. v. George E. Breece Lumber Co., 60 F.(2d) 847, the Circuit Court of Appeals for the Tenth Circuit held, quoting from the syllabus: "Where surety contracted to indemnify against breaches of logging contract by partnership, if partnership was released from performance of contract, such release discharged contract of suretyship."

And, quoting from the opinion, the court said: "If the evidence of the surety company in support of its first affirmative defense was true, the partnership was released on April 1, 1928, from further liability under the logging contract, and Cooper then assumed the completion of such contract as an individual. The surety company contracted to indemnify against breaches of the contract by the partnership or by a surviving partner, as such, carrying out the contract, and the release of Otey and the partnership from the performance of the logging contract discharged the contract of suretyship." See, also, American Surety Co. of New York v. Greek Catholic Union, 284 U.S. 563, 52 S.Ct. 235, 76 L.Ed. 490.

In Sarasota County, Fla. v. American Surety Co. of New York, 68 F.(2d) 543 (C.C.A.5), the court held: "Creditor's release of principal debtor also releases surety because surety could not recover over against principal debtor." See Real Estate-Land Title & Trust Co. v. Commonwealth Bond Corp. (C.C.A.) 63 F.(2d) 237.

In City of East Cleveland v. Fidelity & Deposit Co. of Maryland, 5 F.Supp. 212 (U. S. Dist. Court, No. Dist. Ohio, Eastern Div.), the court held: "Cause of action cannot exist against surety unless cause of action exists against principal." In the body of the opinion the court quoted the general rule as stated in 21 R.C.L. 974, thus: " 'A cause of action can not exist against a surety, as such, unless a cause of action exists against his principal. This rule results as a corollary, from the very definition of the contract of suretyship, that the obligation of the surety being accessory to the obligation of the principal debtor or obligor, it is of its essence that there should be a valid obligation of such a principal, and that the nullity of the principal obligation necessarily induces the nullity of the accessory. And as a general rule the obligation of the surety, as such, cannot exceed that of the principal, it being said that it would be most unjust and in-

congruous to hold the surety liable, where the principal is not bound.'"

Section 9617, Oklahoma Statutes 1931 (15 Okl.St.Ann. § 338), provides: "A guarantor is exonerated, except so far as he may be indemnified by the principal, if by any act of the creditor, without the consent of the guarantor, the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended."

Section 9630, Oklahoma Statutes 1931 (15 Okl.St.Ann. § 377) is as follows:

"A surety is exonerated:

"First. In like manner with a guarantor.

"Second. To the extent to which he is prejudiced by any act of the creditor which would naturally prove injurious to the remedies of the surety or inconsistent with his rights, or which lessens his security; or,

"Third. To the extent to which he is prejudiced by an omission of the creditor to do anything, when required by the surety, which it is his duty to do."

See, also, section 102, page 146, Stearns on the Law of Suretyship which reads in part as follows:

"All defenses available to the principal may in general be resorted to in favor of the promisor in suretyship.

"If the principal has been released by the creditor the surety or guarantor will be released. This follows from the elementary proposition of suretyship, that no collateral promise to pay the debt of another can have any force when the debt of the other has been satisfied, and since the equity of the promisor to have indemnity from the principal is cut off by this transaction, it would be manifestly unjust to require him to pay the debt." See Shuttee v. Coalgate Grain Co., 70 Okl. 6, 172 P. 780.

In Goatman v. Pacific Ready-Cut Homes, Inc., 112 Cal.App. 397, 297 P. 68, 70, the court held: "It requires but little citation to support the rule that, where the principal is discharged, the surety likewise escapes liability."

In Pacific Coast Engineering Co. v. Detroit Fidelity & Surety Co. (Cal.App.) 293 P. 140, 141, the court said: "It is a familiar principle of suretyship that any act of the creditor, by which the principal is discharged from liability, will also discharge the surety."

In West v. Brison, 99 Mo. 684, 13 S.W. 95, 97, the Supreme Court of Missouri said: "If the creditor gives the surety to understand that he will look to the principal debtor alone for payment, and the surety is thereby lulled into security, to his loss, the creditor should suffer the consequences."

In Wilkins v. Hanson, 119 Minn. 399, 138 N.W. 418, 419, Ann.Cas.1914B, 56, the Supreme Court of Minnesota said: "The law is well settled that if a creditor informs a surety that the debt is paid or settled, and thereby lulls the surety into security, inducing him to take no steps to protect himself, the creditor is estopped from thereafter proceeding against the surety, if there is evidence tending to show that the surety was damaged; that is, that he might have protected himself, had he not been induced to take no steps to that end."

In Wolf v. Madden, 82 Iowa 114, 47 N.W. 981, the Supreme Court of Iowa held: "Where a creditor states to a surety that he will not hold the surety for the debt, but will look to the principal alone, and the surety, relying on the statement, takes no steps to collect the debt from the principal, which he could then have done, the surety is released."

It is the contention of the intervener, Crane Company, that, since the original bond was to the United States to protect it from loss for unpaid material or labor bills, a different rule applies.

In Reading Steel Casting Co. v. United States, 268 U.S. 186, 45 S.Ct. 469, 470, 69 L.Ed. 907, the court said: "The contract is to be construed and the rights of the parties are to be determined by the application of the same principles as if the contract were between individuals."

It is also the contention of the intervener, Crane Company, that, assuming the waivers to be authorized, they were procured by duress and therefore were not binding upon Crane Company. There certainly was no obligation resting upon Crane Company to execute the waiver of December 7, 1933. It could have executed it or not, but apparently it did for the purpose of enabling Thompson to secure the contract and to enable it to furnish the material to Thompson. There was no duress exercised to procure the letter of March 1,

1934. The general contractor sent a check to Thompson and asked Thompson to secure the waiver. From all of the evidence in this case, the waiver and letter were signed by Legg for Crane Company merely upon the request of Thompson.

In Willett v. Herrick, 258 Mass. 585, 155 N.E. 589, 596, the Supreme Judicial Court of Massachusetts said: "It is said by the plaintiffs that the general release is inoperative because obtained by duress. In this commonwealth a contract made through fear or by such acts of coercion or undue influence as the plaintiffs rely on is not void; it is merely voidable. It may be ratified by the one who is wronged. Fairbanks v. Snow, 145 Mass. 153, 13 N.E. 596, 1 Am.St.Rep. 446. To set aside an agreement because of duress, the will of the party subjected to it must be overcome, and the means made use of must be such as to overcome the mind of an ordinary person. Morse v. Woodworth, 155 Mass. 233, 27 N.E. 1010, 29 N.E. 525. The duress must be connected with and underlie the contract. See Barbour v. Poncelor, 203 Ala. 386, 83 So. 130. If the plaintiffs were free either to rely on their legal rights or to accept the settlement, and they voluntarily decided to accept the terms proposed and deliver the release, there was no coercion in its execution."

In Hartsville Oil Mill v. United States, 271 U.S. 43, 46 S.Ct. 389, 70 L.Ed. 822, the court held: "A threat to break a contract does not in itself constitute duress, but to infer duress therefrom there must be evidence of some probable consequences of it to person or property, for which the remedy afforded by the courts is inadequate."

James McHugh Sons, Inc., having known of the execution of the waiver of December 7, 1933, were certainly justified in demanding a waiver themselves from Crane Company before the payment of the first estimate, and, in making a demand for the waiver, they were doing nothing more than exercising good business judgment, because if the surety company was not willing to make bond without a waiver they could hardly expect the general contractor to make payments to Thompson without a waiver from Crane Company.

In F. S. Royster Guano Co. v. Hall, 68 F.(2d) 533, 536, the Circuit Court of Appeals, Fourth Circuit, said: "In this day of far-flung business enterprises, it is of more than usual importance to emphasize the rule that corporations cannot have the benefit of transacting business through agents without accepting responsibility for acts within the scope of the authority with which such agents have apparently been clothed. The general rule applicable in such cases was stated by this court in Richmond Guano Co. v. E. I. Du Pont de Nemours & Co. (C.C.A.4th) 284 F. 803, 806, as follows: 'The act of an agent within the apparent, but not within the real scope of his authority, is binding on the principal where loss would otherwise result to one who has in good faith relied on such apparent authority.'"

It is apparent to the court that it was the purpose and intention of Crane Company to enable Thompson to get this contract and to assist him in every way it could because Crane Company evidently had assurance that Thompson would buy the material for his contract from it. Crane Company was therefore willing to rely upon Thompson to pay its debt. There is no contention on the part of the intervener that it can hold Thompson's surety for this debt. It then released James McHugh Sons, Inc., from any obligation.

The rule is clear, as has been cited hereinbefore, that the release of a principal also releases the surety, and for that reason, having released James McHugh Sons, Inc., the intervener certainly could not ask its surety to pay Thompson's obligation. The court therefore concludes that the intervener cannot recover from the defendants New Amsterdam Casualty Company, Hartford Accident & Indemnity Company, the Fidelity & Casualty Company of New York, and the United States Fidelity & Guaranty Company, sureties on the bond of James McHugh Sons, Inc.

The next matter for solution is the controversy between Thompson and Crane Company. Thompson contends that there was a partnership or joint venture.

The court is of the opinion that there is no substantial evidence supporting such contention. Thompson took this contract in good faith and in his own testimony states that the reason why he lost money on the contract was because of the labor situation. He was clearly of the opinion that, under the quotations made to him by Crane Company, he would have a profit of approximately $7,000.

It is the contention also of the intervener that it is entitled to the price on material furnished the subcontractor, which

was current at the time the material was actually furnished. The court cannot agree to this contention for the reason that it is admitted by Legg, as contended by Thompson, that the quotations made prior to the 7th day of December, 1933, were the prices on which Thompson relied in submitting his bid to the general contractor. Crane Company would not be permitted to submit a price on material and then change that price in the event the prices of material increased prior to the time it was actually used or needed, and Legg testified that he approximated the difference in the price of the same material at the time the quotation was made and at the time the material was actually furnished to the subcontractor, at $4,500. In that event, Thompson would be entitled to a credit on the bill of $4,500, and judgment will be rendered in favor of Crane Company against H. W. Thompson, doing business under the name of H. W. Thompson Heating & Engineering Company, in the sum of $24,197.06.

To all of which findings by this court, an exception is allowed each of the parties. A form of findings of fact and conclusions of law, consistent with this opinion, as well as a final judgment in this case, may be submitted.