**MOYER et al. v. UNITED STATES, for Use of TRANE CO. et al.**

**No. 6602.**

United States Court of Appeals
Fourth Circuit.

Argued June 16, 1953.

Decided July 16, 1953.

J. Campbell Palmer, III, Charleston, W. Va., for appellants.

John C. Morrison, Charleston, W. Va. (Jackson, Kelly, Morrison & Moxley and E. D. Knight, Jr., Charleston, W. Va., on the brief), for appellees.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

These suits were brought under the Miller Act, 49 Stat. 793, 40 U.S.C.A. §§ 270a and 270b, by The Trane Company, The Crane Company and Minneapolis-Honeywell Regulator Company, to recover the balance due for materials furnished by them to a subcontractor in the construction of a government armory. The defendants are the prime contractors, A. C. Moyer and J. E. Moyer, partners, doing business as Moyer Brothers, and Continental Casualty Company, their statutory surety on a payment bond. The cases were consolidated for trial, and the District Court, sitting without a jury, entered judgment for the claimant in each case, i. e., $4,949.11 for Trane, $1,614.60 for Crane, and $1,495.00 for Minneapolis-Honeywell, or a total of $8,058.71; whereupon this appeal was taken.

The controversies arise out of a contract of June 16, 1950 whereby Moyer Brothers contracted with the United States to build an armory at South Charleston, West Virginia, at a price of $241,071.50. Pursuant to the statute, Moyer Brothers

posted a payment bond in the amount of $120,535.75, with Continental Casualty Company as surety, for the protection of persons supplying labor and materials for the armory project. On June 30, 1950 Moyer Brothers entered into a subcontract with John R. Kegley for the installation of plumbing, drainage, gas fittings and a heating plant for the armory for the sum of $46,856.55. In the performance of this contract Kegley obtained materials from the claimants and other suppliers not involved here. In accordance with the subcontract he submitted each month to Moyer Brothers an estimate of the amount he had paid for labor during the preceding month, and the amount of materials which had been either incorporated in the building or placed on the job site ready for installation. Materials listed by Kegley on these estimates had not been paid for by him, except for items taken out of his stock. Moyer Brothers, as provided by the contract, paid Kegley 90 per cent of his monthly estimates up to and including the estimate submitted March 1, 1951, retaining 10 per cent.

During the next two or three months occurred the circumstances upon which rests the main defense of Moyer Brothers to the plaintiffs' claims. Moyer Brothers became apprehensive that Kegley had been paid a larger sum under the subcontract than his performance justified. The testimony on the point is conflicting but it is beyond dispute that Kegley had included in his estimates materials which he had installed but had not paid for. Moyer Brothers took two steps to protect themselves. They refused to make further payments to Kegley and demanded that he furnish receipts showing that the materials, which had been delivered to him by the materialmen and included in previous estimates, had been paid for.

Kegley became financially embarrassed about this time and was without the necessary funds to complete the work he had agreed to do. Accordingly he requested Moyer Brothers to furnish the money to meet his weekly payrolls, and they complied, beginning with the payroll of April 13, 1951, but thereafter, except for the payrolls and for the purchase of certain materials necessary for the completion of the job, they paid out no money on account of the work covered by the subcontract. The work was completed by Kegley's employees under the direction of his superintendent, and Kegley himself was on the job from time to time. Moyer Brothers claim to have supervised the performance of the work beginning in April, 1951 until it was finished, but whether their activities in this repect were in excess of those ordinarily performed by a prime contractor is not clearly shown and there is no testimony as to additional expense incurred therefor by Moyer Brothers. The balance due Kegley upon the completion of the contract was $7,463.80.[1] Kegley went into bankruptcy in July or August, 1952.

In the meantime, in the month of May, 1951, Kegley, having been told by Moyer Brothers that they would make no further payments to him until he furnished receipts showing that he had paid for the materials which had been installed by him in the building, obtained from Trane a release of claim for materials furnished to Kegley, and from each of the other claimants a receipt showing payment in full for the articles supplied by them to Kegley. The materials, however had not been paid for and the statements to the contrary in the receipts were incorrect. The claimants, upon executing the papers, received only checks to be held by them for future payment which Kegley hoped to make good when Moyer Brothers honored his estimates. The checks, however, were never paid. Kegley presented the release and receipts to Moyer Brothers as evidence that he had paid the claimants for the goods, and failed to inform Moyer Brothers that the statements therein contained were false. Moyer Brothers, nevertheless, made no

1. Moyer Brothers contend that this sum is subject to certain deductions, such as interest on money advanced to Kegley on payrolls, and money paid by Moyer Brothers for the purchase of materials used on the work; but these items have no bearing on the validity of the claims of the plaintiffs.

further payments, except for payrolls and materials needed in the work.

■ Moyer Brothers contend that the amounts claimed by the plaintiffs and allowed by the court are not due because Moyer Brothers had paid Kegley on his estimates for nearly all of the materials covered by the instant suits; and also because they were deceived by the false certificate and receipts, and led to take actions to their detriment which they would not have performed if they had known the truth. There is, however, nothing in the first position for it is the essence and purpose of the statute and of the payment bond on a government construction project to protect the materialmen and to place the burden on the contractor to make sure that they are paid for the goods which they furnish. Smith v. Mosier, C.C.N.Y., 169 F. 430, 435; Seaboard Surety Co. v. Standard Acc. Ins. Co., 277 N.Y. 429, 433, 14 N.E.2d 778, 117 A.L.R. 658.

■ The main defense is that the materialmen are estopped to sue the contractor and the bonding company because of the false statements in the papers which they signed. On this point the law is also clear since the improper practice in which the claimants engaged in this case finds a parallel in prior cases where false receipts were given by materialmen to a subcontractor to aid him in securing payments from the prime contractor for work done under a subcontract. The prime contractor, in order to protect himself, not infrequently requires a subcontractor to furnish receipted bills to show that the materials installed in the work and included in his estimates, have actually been paid for, and sometimes the materialmen, relying on the promises of the subcontractor, give false receipts to assist him in getting payments from the prime contractor. The rule to be deduced from the cases is that which is embodied in the legal principle of estoppel, which precludes one from denying the truth of statements upon which other persons have relied to their detriment. Territory of Arizona ex rel. Tax Collector of Cochise County v. Copper Queen Consol. Mining Co., 233 U.S. 87, 95, 34 S.Ct. 546, 58 L.Ed. 863.

■ In the application of this rule in suits under the Miller Act and its predecessor, the Heard Act, Act Aug. 13, 1894, 28 Stat. 278, as amended, by claimants against a contractor and his surety on a payment bond, it has been held that a materialman is not precluded from recovering for supplies furnished to a subcontractor by the fact that he has given receipts to the subcontractor falsely stating that the goods have been paid for, unless it is shown that these false statements have caused detriment to the contractor. See United States for Use and Benefit of Farwell, Ozmun, Kirk & Co. v. Shea-Adamson Co., D.C. Minn., 21 F.Supp. 831, 834; United States ex rel. J. B. Klein Iron & Foundry Co. v. James McHugh Sons, D.C.W.D.Okla., 21 F. Supp. 202, affirmed 10 Cir., 108 F.2d 55; United States v. Maryland Casualty Co., D.C.Md., 38 F.Supp. 479; Kansas City Marble & Tile Co. v. Penker Const. Co., 4 Cir., 86 F.2d 287; Pittsburgh Steel Co. v. Standard Acc. Ins. Co., D.C.E.D.S.C., 55 F.Supp. 36; United States, for Use and Benefit of Noland Co. v. Wood, 4 Cir., 99 F.2d 80.

■ Moyer Brothers, in order to bring themselves within this rule, contend that they have suffered detriment in several respects by reason of the false receipts given by the claimants. First, they say that if they had known the truth they would have annulled the subcontractor and completed the work themselves and thereby saved themselves substantial sums of money, because they would have done the work more cheaply—and would have saved the profit which Kegley made on the labor and material which he furnished. When they raised this point in the District Court the judge offered them full opportunity to show what they would have saved by taking this course; but they were unable to offer the necessary evidence. They stated that they had put forth additional effort and increased their supervision of the subcontractor's work when they suspended all payments to him except money for the payrolls; but they offered no evidence to show that these additional efforts involved additional expense. They said that they were not ready to show how much they

would have saved if they had taken over the subcontractor's work in April or May, 1951 and they requested a suspension of the trial in order to secure the necessary evidence; but they admitted that it would be difficult for them to secure the proof and they were unable to assure the court that if the delay were granted, they would be able to sustain their contention. Under these circumstances the judge properly denied their motion for delay and proceeded with the trial. This action was clearly within the discretion of the court and was obviously proper because the defendants offered no explanation as to why they were not prepared at the time of the trial to offer the necessary proof and they failed to assure the court that they would have been able to produce it at a later date.

Moyer Brothers also contend that they were lulled into a sense of security by the false statements in the receipts and led to assent to the delivery of additional materials by the claimants after the expiration of the period of 90 days within which a claimant under § 270b of the statute must give written notice of his claim to the contractor as a condition precedent to a suit on the bond. The 90 day period runs from the date on which the claimant performed the last of the labor or supplied the last of the material for which the claim is made; and Moyer Brothers say that if they had known the facts they would have been on the lookout and in some way, not clearly shown, would have prevented the delivery of the goods.

This contention was not made in the District Court and the evidence with respect to the deliveries was not taken with the point in mind. Enough, however, appears to show that the contention is without merit. In each case the last delivery of material was made within the 90 day period and consisted of goods actually needed for the completion of the job. Crane's receipt was signed on May 14, 1951. Subsequently the only delivery consisted of goods in the amount of $14.21 made on May 29; and notice of the claim for $1,614.60 was mailed on August 29. Minneapolis-Honeywell's receipt was signed May 15, 1951. The last deliveries were made on May 21 and October 5, and notice of their claim for $1,495 was mailed on August 9, 1951. Their installation of material was completed in September, 1951. Trane's receipt was dated May 8, 1951 at which time it had already delivered material in the sum of $4,724.74. Its only later delivery of goods in the sum of $224.37 was made on November 14, and notice of claim was sent on December 4.

This evidence does not justify the conclusion that the contractors would or could have rejected the last deliveries. They had not annulled the subcontract and Kegley still retained control of the work so that it does not appear that Moyer Brothers had the right to reject deliveries of materials that were needed. Moreover, the evidence does not show precisely when Moyer Brothers were shown the false receipts; but it is clear that they knew that the Minneapolis-Honeywell receipt was false on August 9 and that the Crane receipt was false on August 29, when these materialmen gave notice of their respective claims. Indeed Moyer Brothers had known from the month of April that Kegley was in financial difficulties because from April until the end of August they advanced the money for Kegley's payrolls.

Nevertheless with these facts before them and with good reason to believe that Trane's certificate of release was also false, they took no steps to reject the delivery of material by Trane in the subsequent November. Their action may have been influenced by their knowledge that the claimants had actually supplied material for the job and were equitably entitled to payment, and that the aggregate claims of the materialmen amounted to $8,058.71 against which there was a balance due the subcontractor of $7,463.80. But whatever their motive, they took no action to prevent Trane's last delivery and we cannot now reject the plaintiffs' claims on the mere supposition that Moyer Brothers would have acted differently if they had known that the receipts were false from the beginning.

Affirmed.