UNITED STATES of America for and on Behalf of WEST CHESTER ELECTRIC & ELECTRONICS CO., INC., and West Chester Electric & Electronics Co., Inc., Appellants,

v.

SENTRY INSURANCE, Seaboard Surety Company, and G.H. Coffey Company, Inc., Appellees.

No. 84–2038.

United States Court of Appeals, Fourth Circuit.

Argued June 4, 1985.

Decided Oct. 3, 1985.

Rehearing and Rehearing In Banc Denied Nov. 19, 1985.

Randall C. Schauer, West Chester, Pa., (MacElree, Harvey, Gallagher, O'Donnell & Featherman, Ltd., West Chester, Pa., John W. Taylor, Faircloth, Anderson & Taylor, Cyrus J. Faircloth, Fayetteville, N.C., on brief), for appellant.

Koy E. Dawkins, Monroe, N.C., Kenneth R. Wooten, New Bern, N.C., (Dawkins, Glass & Lee, Monroe, N.C., Ward & Smith, P.A., New Bern, N.C., on brief), for appellees.

Before WIDENER and ERVIN, Circuit Judges, and HOFFMAN, United States District Judge for the Eastern District of Virginia, sitting by designation.

ERVIN, Circuit Judge:

This is an appeal from an order granting summary judgment to the defendants in an action alleging breach of contract under the Miller Act, 40 U.S.C. §§ 270a–270d and North Carolina state law. West Chester Electric and Electronics Company, Inc. (hereinafter "West Chester") agreed to supply materials to G.H. Coffey Company, Inc. (hereinafter "Coffey"), a subcontractor of Dickerson, Inc. (hereinafter "Dickerson") on Dickerson's contract to repair and renovate runways at the U.S. Marine Corps Air Station at Cherry Point, North Carolina. Dickerson was bonded by Seaboard Surety Company (hereinafter "Seaboard") and Coffey was bonded by Sentry Insurance Company (hereinafter "Sentry"). In agreeing to supply Coffey with materials, West Chester secured an agreement with Coffey that the contract price would include $100,000 which represented Coffey's previous indebtedness to West Chester. All but $86,923.80 was paid to West Chester under the contract. West Chester brought suit against Seaboard and Sentry for the remaining amount due. The case was referred to a magistrate who granted summary judgment to Seaboard on a misapplication of funds defense, denied summary judgment to Sentry on the same question, and granted partial summary judgment to both Seaboard and Sentry as to $15,000 that the magistrate found West Chester had loaned to Coffey. Upon *de novo* review, the district court reversed the partial denial of summary judgment to Sentry, affirmed all other aspects of the magistrate's order, and dismissed the case. West Chester now appeals. We affirm in part and reverse in part.

## I.

On or about February 13, 1981, the United States Navy awarded Dickerson a contract to repair runways at the U.S. Marine Corps Air Station at Cherry Point, North Carolina. On March 6, 1981, Dickerson awarded Coffey a subcontract for electrical and lighting work on some of the runways. On or about the same date, Coffey contracted with West Chester for the supply of electrical materials on the project. On February 13, 1981, Seaboard, as surety for Dickerson, issued a payment bond on the Cherry Point project. On April 6, 1981, Sentry, as surety for Coffey, also issued a payment bond on the project.

West Chester only agreed to supply materials to Coffey after a rather unusual financing scheme was agreed to. This was due to the fact that Coffey owed West Chester money from two previous jobs. West Chester's contract price of $410,321 was to include $100,000 of prior debt owed to West Chester by Coffey.[1] The prior debt was added into the billing for each piece of electrical equipment supplied on the project, increasing the price of each item by approximately 30%. In addition, West Chester and Coffey agreed that payments from Dickerson would be jointly payable to West Chester and Coffey, or directly payable to West Chester. The negotiations between West Chester and Coffey resulting in this agreement occurred in late February and early March, 1981.

Sentry was aware of this payment scheme when it issued its payment bond on behalf of Coffey. It liked the idea because Sentry was the surety on Coffey's prior debt to West Chester. Sentry issued a standard payment bond securing the performance of Coffey's contract with Dickerson. The bond enured "to the benefit of all persons supplying labor and materials in the prosecution of the work provided for in said subcontract." It provided that "if [Coffey] shall promptly make payment to all persons supplying labor and material in

---

[1]. The actual cost for materials supplied, including eight per cent profit for West Chester, was $310,000. West Chester claims that the $410,321 contract price did not inflate the cost of the Cherry Point project because Crouse-Hinds, the manufacturer of the equipment supplied by West Chester, had quoted Coffey a price of $405,000, and Coffey had based its bid on this figure. Crouse-Hinds later gave West Chester, as distributor, a quotation of $288,000. West Chester added eight per cent profit plus the $100,000 prior debt to come up with the $410,321 contract price.

the prosecution of the work provided for in said Subcontract, and any and all modifications of said subcontract that may hereafter be made, then this obligation shall be null and void." (JA 12). Because Seaboard issued its payment bond on behalf of Dickerson prior to the negotiations between West Chester and Coffey, Seaboard did not have knowledge of the scheme at the time it issued its bond.

The $410,321 owed to West Chester under the materials contract was subsequently increased to $452,303.05, which included an additional $14,220.52 of prior debt owed West Chester by Coffey. Over the course of the contract Dickerson made payments totalling $552,303.05 by joint checks payable to West Chester and Coffey. This figure included funds owed by Dickerson to Coffey for Coffey's work on the project.

West Chester received all it was owed on the project except $86,923.80. Fifteen thousand dollars of that amount was paid by Dickerson to West Chester and Coffey jointly and ended up in Coffey's possession. The magistrate found that West Chester had loaned this sum to Coffey. West Chester now seeks recovery of the $86,923.80 from Sentry and Seaboard.

## II.

When a debtor makes payment to a creditor on a secured debt and the creditor applies the payment to a different obligation, the surety is no longer bound to cover the debt for which payment was made. Under the misapplication of funds doctrine, "[t]he surety in such a case is entitled to have the payment applied to the debt for which [it] is bound." *United States for the Use and Benefit of Crane Co. v. Johnson, Smathers and Rollins*, 67 F.2d 121, 123 (4th Cir.1933); *accord United States Casualty Co. v. Noland Co.*, 286 F.Supp. 333, 337–39 (M.D.N.C.1968) (interpreting North Carolina law). However, notice to the surety of the redirection of funds can, in certain circumstances, render the misapplication of funds doctrine inapplicable. If a creditor notifies a surety that it intends to apply payments on a secured debt to a different obligation, such notice will alter the creditor's obligation to apply the payments to the secured debt if the creditor relied to its detriment on the surety's conduct. For example, if the surety has knowledge of the redirection of funds and, through its actions, leads the creditor to believe that it intends to continue to secure the entire remaining debt, the surety may be estopped from asserting a misapplication of funds defense to avoid liability on the secured debt. *United States for the Use and Benefit of Hyland Electric Supply Co. v. Franchi Brothers Construction Corp.*, 378 F.2d 134, 138 (2d Cir.1967). West Chester argues that material facts remain in dispute as to its detrimental reliance on Sentry and Seaboard's knowledge of and acquiescence in the payment arrangement between West Chester and Coffey, and hence the sureties are not entitled to summary judgment on a misapplication of funds defense.

### A. *Seaboard*

West Chester argues that Dickerson had knowledge of the payment arrangement, that Dickerson's knowledge can be imputed to its surety, Seaboard, and that West Chester relied to its detriment on Seaboard's imputed knowledge of and acquiescence in the scheme. This argument can be disposed of through an examination of the timing of negotiations between various participants in the Cherry Point project. The magistrate found that Seaboard issued its bond on the project on February 20, 1981. The agreement between West Chester and Coffey was arranged in "late February and early March 1981. Any discussion that Dickerson might have had concerning the side arrangement would have had to have occurred after March 6, 1981." (JA 79). Dickerson's alleged subsequent knowledge of the scheme cannot be imputed to Seaboard since the scheme came to fruition after Seaboard issued its bond. West Chester could not have detrimentally relied on any action of Seaboard, as the surety had simply signed a standard payment

bond prior to West Chester's negotiations with Coffey.

All Seaboard must show to invoke a misapplication of funds defense is knowing misapplication of funds by West Chester. *Crane,* 67 F.2d at 123. Because West Chester knowingly used funds paid under the Cherry Point Project to cover an unrelated debt, Seaboard was entitled to the misapplication of funds defense, and to summary judgment in its favor.

### B. *Sentry*

In granting summary judgment in favor of Sentry, the district court declined to consider evidence of Sentry's knowledge of and apparent approval of the Coffey/West Chester payment scheme under the parol evidence rule. The court found Sentry's obligation under its payment bond to be unambiguous, and concluded that the language of the bond did not contemplate securing the portion of payments representing Coffey's prior debt. On this basis, the district court granted summary judgment in favor of Sentry.

■ Parol evidence is inadmissible to vary the terms of an unambiguous agreement. However, parol evidence may be properly considered when the meaning of an agreement is unclear. *Jaftex Corp. v. Aetna Casualty and Surety Co.,* 617 F.2d 1062, 1063 (4th Cir.1980) (citing North Carolina cases). Sentry's bond secures payment for the supply of "labor and materials in the prosecution of the work" at Cherry Point. (JA 12). The bond incorporates by reference Coffey's subcontract with Dickerson. An ambiguity arises when the payment bond is considered together with the subcontract. The subcontract contemplated that $410,321 would be paid for electrical materials. That sum included the $100,000 of prior debt incorporated into the contract price. A portion of the debt would be added to the cost of all materials proportionately. Due to the nature of the subcontract, it is unclear whether Sentry's agreement to secure payment for materials on the subcontract was an agreement to secure payment for the actual or the inflated cost. Under these circumstances, an examination of parol evidence to determine the parties' intent is proper.

■ The parol evidence in this case gives rise to a material question of fact concerning West Chester's possible reliance on Sentry's approval of the payment scheme, making summary judgment on Sentry's behalf inappropriate. *See Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979). Coffey and West Chester agreed upon the payment scheme in late March or early April of 1981. On March 6, 1981, Dickerson awarded Coffey the subcontract. On or about the same date, Coffey entered its contract with West Chester. On April 6, 1981, Sentry issued its payment bond. Prior to issuing the bond, Sentry had knowledge of the Coffey/West Chester arrangement and apparently liked it. Sentry stood to benefit from the arrangement because it was potentially liable as the surety on Coffey's prior debt. Under these circumstances, material facts remain in dispute as to whether Sentry's actions led West Chester to reasonably believe that the entire, inflated cost of materials would be secured, and whether West Chester consequently relied to its detriment on Sentry's conduct. Accordingly, we reverse the district court's grant of summary judgment in favor of Sentry on this point.

### III.

■ West Chester claims that the district court improperly granted summary judgment with respect to $15,000 which the district court found was a "loan" to Coffey. According to West Chester, West Chester and Coffey received a $35,000 check from Dickerson in September of 1981. West Chester was apparently entitled to the entire amount. Nevertheless, Coffey received $15,000. West Chester claims that "Coffey required payment of $15,000.00 to it before it would sign the check.... West Chester was put in the position of receiving either $20,000.00 or nothing. West Chester elected to take $20,000.00 from that payment and continue on the project." Brief for Appellant at 25–26.

Whether or not it could be called a loan, West Chester allowed Coffey to have the $15,000. Dickerson had paid the funds as part of a check jointly payable to West Chester and Coffey, pursuant to an agreement between the parties. West Chester was presumably entitled to the money. Whether benevolence on West Chester's part or coercion on Coffey's part led to redirection of the funds, the sureties cannot be held liable for the subsequent redirection of funds paid when the principal took proper steps to ensure payment. *Graybar Electric Co. v. John A. Volpe Construction Co.*, 387 F.2d 55, 59–60 (5th Cir.1967) (by issuing check jointly payable, principal did all it could to ensure payment and cannot be liable for misapplication of funds by payee); *accord Bill Curphy Co. v. Elliott*, 207 F.2d 103, 109 (5th Cir.1953). Summary judgment in favor of Sentry and Seaboard with respect to these funds was therefore proper.

Accordingly, the judgment of the district court is affirmed in part and reversed in part, and the case remanded for further proceedings.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.