**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 09-1170**

_____


UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF DAMUTH
SERVICES, INCORPORATED, trading as Damuth Trane; DAMUTH
SERVICES, INCORPORATED, trading as Damuth Trane,

            Plaintiffs - Appellants,

       v.

WESTERN SURETY COMPANY,

            Defendant – Appellee,

       and

H&L MECHANICAL, INCORPORATED,

            Defendant.

_____

Appeal from the United States District Court for the Eastern
District of Virginia, at Norfolk.  Robert G. Doumar, Senior
District Judge. (2:08-cv-00030-RGD-TEM)

_____

Argued: January 26, 2010          Decided: March 4, 2010

_____

Before GREGORY and DUNCAN, Circuit Judges, and Catherine C.
BLAKE, United States District Judge for the District of
Maryland, sitting by designation.

_____

Affirmed by unpublished opinion.  Judge Duncan wrote the
opinion, in which Judge Gregory and Judge Blake joined.

**ARGUED:** Glen William Thompson, PENDER & COWARD, PC, Virginia Beach, Virginia, for Appellants.   John Harvey Craddock, Jr., LECLAIR RYAN, PC, Richmond, Virginia, for Appellee.  **ON BRIEF:** Richard H. Matthews, PENDER & COWARD, PC, Virginia Beach, Virginia, for Appellants.   Joseph M. Rainsbury, LECLAIR RYAN, PC, Richmond, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

This is an appeal from a grant of summary judgment on a claim under the Miller Act, 40 U.S.C. § 3131 et seq. The Act requires general contractors who enter into contracts with the government to obtain bonds from sureties "for the protection of all persons supplying labor and material in carrying out the work provided for in the contract." Id. § 3131(b)(2). Damuth Services, Inc. ("Damuth"), a materialman, filed a claim under the Miller Act on a payment bond obtained by the general contractor after the subcontractor for which Damuth supplied material went out of business. The district court granted summary judgment to the general contractor's surety on the bases of equitable estoppel and unclean hands. Damuth now appeals. For the reasons that follow, we affirm.

I.

In September 2005, Viteri Construction Management, Inc. ("VCMI"), entered into a contract with the United States government to expand and modify an existing Coast Guard station in Chesapeake, Virginia (the "CAMSLANT" project). Because this contract was valued at more than $100,000, VCMI was required by the Miller Act to obtain a payment bond. Id. § 3131(b)(2). VCMI secured this bond from appellee Western Surety Co. ("Western") in the amount of $2,675,738.00. VCMI's owners,

3

Carlos Viteri and his wife (the "Viteris"), guaranteed the bond personally.

As part of the CAMSLANT project, VCMI had to install new HVAC equipment. VCMI entered into a subcontract with H&L Mechanical, Inc. ("H&L"), to perform that work. H&L's work was to be performed "in compliance with all [applicable] national, federal, state, and local codes." J.A. 62. H&L, in turn, engaged the services of a materialman, Damuth, to supply the HVAC parts.

On November 16, 2006, Damuth supplied H&L with $160,205.85 in HVAC equipment and related support services. On November 21, 2006, H&L invoiced VCMI for $185,811.31 in work performed on the CAMSLANT project, which included Damuth's amount. As part of its payment request, H&L signed a form that said:

> I . . . certify that payments, less applicable retainage, have been made (through the period covered by previous payments received from Viteri Construction Management, Inc.) to all my subcontractors, for all materials and labor used in, or in connection with the performance of this Contract.

Id. at 152. On January 5, 2007, VCMI paid H&L $185,811.31, the full amount requested. Rather than pay Damuth its invoiced amount, however, H&L applied the funds to debts owed on

4

unrelated projects.  H&L did this despite a self-recognized obligation to use the VCMI payment to pay Damuth.[1]

By February 15, 2007, Damuth had become concerned that it had not been paid, and arranged to meet with H&L to discuss the matter.  At the meeting on February 27, Damuth learned that H&L had spent its invoiced amount paying off other debts and was, in fact, facing significant financial difficulties.

Damuth was generally aware that H&L was to use the payment from the CAMSLANT project to pay Damuth for its work.[2]  Damuth,

---

[1]  H&L's president, John Hartman, testified in a deposition as follows:

> Q:  Okay.  At the time you knew, you being H&L and John Hartman, you knew this money, $185,811.31, that [VCMI] paid to H&L on January 5th, 2007, $160,205.85 was intended to pay Damuth Trane for its equipment?
>
> . . . .
>
> A:  Yes.  Me [sic] being the president of H&L Mechanical knew that the money that came in needed to go to pay that invoice, correct.

J.A. 88.

[2]  William Mitchell, the corporate representative for Damuth, testified in a deposition as follows:

> Q:  Okay.  So Damuth knew that [H&L] had been paid for your supplies, right, your material?
>
> A:  Yes.
>
> . . . .

(Continued)

5

however, was persuaded that in order for H&L to make good on its debt, H&L would need "to continue doing business." Id. at 120. Damuth therefore entered into an agreement with H&L over the repayment of monies owed. H&L agreed to pay Damuth on all debts owed for non-CAMSLANT project work, an amount that came to $6,031.22. H&L would also make a series of payments between April and September 2007, on the fifteenth of each month, until Damuth had been paid in full for the CAMSLANT project. In exchange, Damuth agreed not to inform VCMI of H&L's non-payment. Damuth also "reserv[ed] [the] right to go to [VCMI]" if H&L did not keep its word. Id. at 124.

After the meeting, Damuth continued to perform work, but H&L never made a payment under their agreement. Meanwhile, H&L received an additional $105,000 from VCMI on CAMSLANT-related work after the initial $185,811.31 payment. At least $33,024.88 of that money came after H&L met with Damuth on February 27, 2007.

---

Q: Okay. And then was it Damuth's understanding that once [VCMI] paid H & L the amount that was for your invoice, that H & L would just turn around and cut that money back to you?

A: That is a standard industry practice, yes.

J.A. 119.

6

On May 1, 2007, H&L met with Damuth a second time to renegotiate their agreement. At that point, H&L agreed to pay Damuth $5,000 per week for thirty-four weeks, beginning on May 11, 2007, until Damuth had received $170,000. On May 16, 2007, however, H&L went out of business without ever making an installment payment. On June 5, 2007, Damuth gave notice to VCMI and its surety, Western, of its intent to make a claim upon the payment bond.

On January 17, 2008, Damuth filed a two-count complaint in the United States District Court for the Eastern District of Virginia. In Count I, Damuth requested judgment against Western in the amount of $161,020.65, plus interest and costs, as payment upon the bond for its performance on the CAMSLANT project. Count II incorporated the same request against H&L. H&L, who was properly served with the complaint, did not respond and the district court entered default judgment against it. Western filed an answer to the complaint, asserting several affirmative defenses, including the equitable doctrines of equitable estoppel and unclean hands. Western and Damuth thereafter filed cross-motions for summary judgment.

On January 21, 2009, the district court granted summary judgment to Western. The district court found that Damuth's claim upon the bond was barred by equitable estoppel and unclean hands. First, the district court found that Damuth's agreement

7

to remain silent about H&L's diversion of the CAMSLANT project payment was sufficient to invoke estoppel:

> VCMI received money from the government, VCMI paid H&L in full for Damuth's work on the [CAMSLANT] project, and H&L diverted that money to other creditors for matters unrelated to the contract with VCMI. Damuth was aware of these events and . . . it agreed not to advise the general contractor in consideration of receiving funds for unrelated transactions.

J.A. 519. The district court also noted the injustice that would follow if Damuth were allowed to make a claim upon the bond, for it would require the Viteris, as personal guarantors of the bond to Western, to pay twice for the HVAC equipment.

Second, the court determined that H&L's decision to apply the CAMSLANT project payments to unrelated debts was a criminal act in Virginia under Va. Code Ann. § 43-13, and so the district court reasoned that Damuth entered into an illegal bargain with H&L when it agreed to keep silent about H&L's conduct. Since Damuth helped to conceal a criminal act and imposed a burden upon VCMI to pay monies it otherwise would not have to pay, the court concluded that Damuth's claim was barred by unclean hands.

## II.

On appeal, Damuth challenges the district court's grant of summary judgment to Western, primarily arguing that the district

8

court misapplied the doctrine of equitable estoppel.[3] We review a district court's grant of summary judgment de novo. Shipbuilders Council of Am. v. U.S. Coast Guard, 578 F.3d 234, 243 (4th Cir. 2009). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On summary judgment, we review the evidence in the light most favorable to the non-moving party. Pueschel v. Peters, 577 F.3d 558, 563 (4th Cir. 2009).

It is well settled that equitable estoppel is a proper affirmative defense to a Miller Act claim. U.S. ex rel. Humble Oil & Ref. Co. v. Fidelity & Cas. Co. of N.Y., 402 F.2d 893, 897 (4th Cir. 1968); Moyer v. U.S. ex rel. Trane Co., 206 F.2d 57, 60 (4th Cir. 1953). To assert equitable estoppel, a defendant must show, as the first necessary element of the defense, that the plaintiff made a representation of fact that was misleading.[4]

---

[3] Damuth also challenges the district court's application of unclean hands to its claim. We recognize that unclean hands and equitable estoppel are distinct doctrines, and that application of the former in this context presents a novel issue. We need not reach it, however, because our holding on equitable estoppel alone is sufficient to resolve this appeal.

[4] The defendant must also show reliance by the defendant on the representation, a change in position due to the reliance, (Continued)

_Humble Oil_, 402 F.2d at 898. The defendant need not show that the plaintiff practiced deception upon it; rather, the question is whether the plaintiff, having committed its actions, should be able to repudiate them. _U.S. ex rel. Noland Co. v. Wood_, 99 F.2d 80, 82-83 (4th Cir. 1938).

Damuth maintains that the district court erred in finding its agreement with H&L to constitute a misleading representation. Damuth argues that, because the effect of its bargain was simply not to inform VCMI of H&L's conduct, its conduct amounts to nothing more than "mere silence." We need not resolve here the question of whether a finding of equitable estoppel can ever be premised solely on silence, however, for the facts here go beyond passive silence.

Our precedent under the Miller Act establishes that a materialman makes a misrepresentation by acting with the subcontractor to enable the subcontractor to mislead the general contractor and surety. In _Moyer_, for example, we said that a

---

and detriment as a result. _Humble Oil_, 402 F.2d at 898. Damuth has not raised any arguments concerning these other elements. In any event, we have reviewed the record carefully and are satisfied that Western met its burden of establishing each element. VCMI reasonably relied on the representation, made by H&L and left uncontradicted by Damuth, that H&L had met its own obligations. Based on that reliance, VCMI continued to make payments to H&L and, as a result, is now subject to the potential of double payment.

10

misrepresentation could be made out where a materialman provided falsified receipts to the subcontractor so that the subcontractor could obtain progress payments from the general contractor.[5]  206 F.2d at 60.

In United States ex rel. Gulfport Piping Co. v. Monaco & Son, Inc., 336 F.2d 636 (4th Cir. 1964), we found equitable estoppel appropriate where a materialman acquiesced in a subcontractor's misleading representation to the general contractor.  In that case, Durant, the subcontractor, represented to Monaco and Son, the general contractor, that it was a fabricator of material.  Unbeknownst to Monaco and Son, Gulfport Piping was the true fabricator, but it allowed Durant to put its own letterhead on all the bills of lading, freight bills, and packing tickets, which gave Monaco and Son the impression that Durant was the fabricator.  Id. at 637–38.  When Durant did not pay Gulfport Piping, the latter filed a claim upon Monaco and Son's Miller Act bond.  On appeal, we affirmed

---

[5] Similarly, in Graybar Electric Co., Inc. v. John A. Volpe Construction Co., Inc., 387 F.2d 55 (5th Cir. 1967), a subcontractor endorsed checks received from the general contractor to the materialman.  The materialman then endorsed the checks back to the subcontractor so that the materialman could represent an artificial unpaid balance on its account, thereby allowing the subcontractor to obtain further progress payments from the general contractor.  Id. at 56-57.  The Fifth Circuit found that the materialman's conduct amounted to a misrepresentation.  Id. at 59.

the district court's application of equitable estoppel, reasoning that Monaco and Son had regarded Durant as the manufacturer and that Gulfport Piping "knew of and acquiesced in the misrepresentation." Id. We found relevant the fact that, had Monaco and Son known that Gulfport Piping was the materialman and thus entitled to Miller Act protection if Durant did not pay, it would have acted differently.[6] Id. at 639.

The same type of conduct that led us to find misleading representations in Moyer and Gulfport Piping occurred here. H&L had an obligation, of which Damuth was generally aware, to use the payment from VCMI to pay Damuth for its work on the CAMSLANT project. Damuth's awareness of this obligation is evidenced by its belief that advising VCMI of H&L's failure to pay would prevent H&L from being able to "continue doing business." J.A.

---

[6] United States ex rel. Lincoln Electric Products Co., Inc. v. Greene Electrical Service of Long Island, Inc., 379 F.2d 207 (2d Cir. 1967), upon which Damuth seeks to rely, is not to the contrary. In Lincoln Electric, the materialman, Lincoln Electric, performed work for a subcontractor, Greene. Greene never paid Lincoln Electric, despite receiving reimbursement from the prime contractor, McTeague. Lincoln Electric's only notice of the subcontractor Greene's nonperformance, however, was that a single check from Greene bounced. Id. at 209. When Greene went out of business, the Second Circuit allowed a Miller Act claim on McTeague's surety. Id. Significantly, the record reflected no knowledge by Lincoln Electric of any diversion of funds by Greene, and no collusive acts between Greene and Lincoln Electric to secure payments from McTeague. Id. at 210. Damuth can draw no comfort from such easily distinguishable facts.

120. Furthermore, this obligation, which was spelled out in the general contract,[7] has been well recognized. For example, we have long declined to hold a surety liable unless the subcontractor applies payments to creditor materialmen on jobs for which the surety has provided the bond. See U.S. ex rel. Crane Co. v. Johnson, Smathers & Rollins, 67 F.2d 121, 123 (4th Cir. 1933) ("[W]hen . . . a payment is made by the debtor to the creditor with the identical money for the payment of which the surety is bound, or with the proceeds or fruits of the very contract, business, or transaction covered by the obligation of the surety, the application of the payment to some other debt, with or without the direction or consent of the debtor, does not bind the surety."); see also U.S. ex rel. W. Chester Elec. & Elecs. Co., Inc. v. Sentry Ins., 774 F.2d 80, 85 (4th Cir. 1985) (refusing liability to a surety when the general contractor paid the subcontractor and materialman with a joint check, as they had requested pursuant to a side deal relating to past debts between them, and the side deal went awry, because "the suret[y]

---

[7] Beyond being a general criminal statute that would apply by its very terms, Va. Code Ann. § 43-13 was a part of this agreement, for H&L's subcontract included a clause requiring it to perform "in compliance with all [applicable] national, federal, state, and local codes." J.A. 62. See Overstreet v. Commonwealth, 67 S.E.2d 875, 877 (Va. 1951) (holding that contractors bargain with an understood knowledge of section 43-13's existence, and that the statute "becomes a part of every contract covered by its terms").

13

cannot be held liable for the subsequent redirection of funds paid when the principal took proper steps to ensure payment"). This rule has been well understood to place an obligation on the subcontractor to apply payments to materialmen on related jobs only. Graybar, 387 F.2d at 59; U.S. ex rel. Hyland Elec. Supply Co. v. Franchi Bros. Constr. Corp., 378 F.2d 134, 137-38 (2d Cir. 1967); St. Paul Fire & Marine Ins. Co. v. U.S. ex rel. Dakota Elec. Supply Co., 309 F.2d 22, 29-30 (8th Cir. 1962); U.S. ex rel. Carroll v. Beck, 151 F.2d 964, 966 (6th Cir. 1945).

H&L's obligation is, moreover, codified by Virginia law, which criminalizes the actions of a subcontractor that diverts funds owed to a materialman on a particular job. See Va. Code. Ann. § 43-13. Contrary to Damuth's contention, the fact that this statute may be prosecuted upon the filing of a complaint by the injured materialman does not undermine its consideration here, for the conduct at issue falls within the bounds of that which Virginia has deemed criminal. See Overstreet, 67 S.E.2d at 877 ("[Section 43-13] was enacted in the exercise of the police power, in that its object is the prevention of fraud and becomes a part of every contract covered by its terms.").

In light of these legal and contractual obligations, Damuth's conduct takes on an affirmative cast. When Damuth learned that H&L had disregarded its obligation, Damuth's response was to strike a bargain with H&L, by which Damuth

14

procured a consideration, i.e., payment, in exchange for a promise not to "tell." When asked why Damuth would do such a thing, it answered, "so that [H&L] could make payments and continue doing business." J.A. 120. Even viewing the evidence in the light most favorable to Damuth, the only logical inference of this exchange is that it enabled H&L to continue representing to VCMI that Damuth had been paid for the CAMSLANT project, and for H&L to continue accepting payments from VCMI. Damuth seeks to minimize the significance of the exchange, pointing out that it merely received funds which it was already owed. This overlooks the fact that the VCMI payment Damuth was to receive was gone, and Damuth had reason to believe no funds would be forthcoming. As the record makes clear, Damuth considered H&L's renewed commitment to pay of sufficient significance to negotiate for it twice.

Moreover, Damuth gave value in the exchange. Prior to the agreement, Damuth was free to inform VCMI of H&L's conduct if it wished. The effect of the bargain was that Damuth bound itself not to do so. The record is undisputed that VCMI paid, and continued to pay, H&L for the CAMSLANT project with the understanding that H&L would pay its own subcontracting parties.[8]

---

[8] Carlos Viteri testified as follows:

(Continued)

15

H&L signed a form statement that it would apply monies received from VCMI to debts owed on the CAMSLANT project, and VCMI stated in a deposition that it relied on this representation when making payments. VCMI asserted, and Damuth did not dispute, that had VCMI known the truth, it would have taken materially different actions before H&L went out of business, for VCMI's owners, the Viteris, were personally liable on the payment bond.

Damuth and H&L acted affirmatively in concert to cause VCMI to believe that H&L had discharged its obligation to pay for services rendered. This makes the bargain struck by Damuth analytically similar to the false receipts provided in Moyer, 206 F.2d at 60, and the misleading arrangement undertaken in Gulfport Piping, 336 F.2d at 639. In line with this precedent, Damuth's conduct exceeds the bounds of mere silence, and is sufficient to satisfy the requirement of a misleading representation for purposes of the doctrine of equitable

Q: . . . You believe that you shouldn't have to pay if VCMI has already paid H&L?

A: Right.

Q: Are there any . . . facts that you believe would provide or would prevent you or release you from having to pay on Damuth's claim?

A: Based on what we received from H&L and what we expected to by contract, I have met my obligation.

J.A. 307.

16

estoppel.[9]  See FDIC v. Harrison, 735 F.2d 408, 413 (11th Cir. 1984) (stating that estoppel requires the presence of "words, acts, conduct or acquiescence causing another to believe in the existence of a certain state of things"); see also U.S. ex rel. Krupp Steel Prods., Inc. v. Aetna Ins. Co., 923 F.2d 1521, 1527 (11th Cir. 1991) ("[T]he central notion of the estoppel defense is that A cannot either intentionally or negligently represent to B that one state of affairs exists . . . and then pursue his normal statutory remedy when it becomes apparent that the state of affairs represented is inaccurate or false.").

III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

[9] Damuth argues that if equitable estoppel is appropriate, then the district court erred in finding that estoppel was appropriate to bar its claim on the bond completely. Damuth contends that estoppel should only undercut its ability to claim two amounts, namely its full amount requested offset by either the $6,031.22 that it accepted from H&L for non-CAMSLANT work, or the $33,024.88 that H&L accepted from VCMI after the February 27 agreement. We decline to consider Damuth's contentions, for Damuth did not argue them to the district court. In the absence of extraordinary circumstances, we do not consider arguments made for the first time on appeal. Williams v. Prof'l. Transp. Inc., 294 F.3d 607, 614 (4th Cir. 2002). No such circumstances are present here. In any event, as the district court noted, Damuth is estopped by its conduct from bringing a claim on the bond. It therefore could not claim any amount.

17