**UNITED STATES of America ex rel. WESTINGHOUSE ELECTRIC d/b/a Westinghouse Electric Supply Company, Appellant,**

v.

**JAMES STEWART COMPANY, a corporation, New Amsterdam Casualty Company, a corporation, Appellees.**

**No. 18967.**

United States Court of Appeals Ninth Circuit.

Sept. 1, 1964.

Rehearing Denied Dec. 17, 1964.

Ralph W. Hoffman, Behymer, Hoffman & Hunt, Los Angeles, Cal., for appellant.

Martin J. Kirwan, Ives, Kirwan & Dibble, Kenneth Lewis, Anderson, McPharlin & Conners, Los Angeles, Cal., for appellees.

Before CHAMBERS and BARNES, Circuit Judges, and McNICHOLS, District Judge.

McNICHOLS, District Judge.

This is an appeal from a District Court jury verdict in favor of the defendants (appellees) on a Miller Act claim (40 U.S. C.A. 270b). Appellant, Westinghouse Electric Company, (hereinafter referred to as Westinghouse) brought claim as an unpaid materialman of a subcontractor, Mojave Electric Company,[1] (hereinafter referred to as Mojave) against the appellees, James Stewart Company (hereinafter referred to as Stewart), the prime contractor, and Amsterdam Casualty Company (hereinafter referred to as Amsterdam or as the surety), surety, on the statutory payment bond (40 U.S.C.A. 270a).

Stewart entered into a contract, dated April 30, 1958, with the United States of America, through the Department of Navy, for the construction of a training building at N.A.S. Miramar, San Diego, California (hereinafter called the Miramar Job) for the contract price of $710,-000.00. Amsterdam was surety on the payment bond required by the Miller Act. Stewart subsequently subcontracted with Mojave for the performance of electrical work; and Westinghouse furnished electrical material to Mojave to be used on the Miramar Job.

There is conflicting but substantial evidence supporting the following factual situation: In late November, 1958, Stewart management became concerned as to the status of payments by Mojave to Westinghouse for material furnished on the Miramar Job. Some $18,000.00 had been paid to Mojave and a $50,000.00 payment was about to be made. A phone call was initiated by Stewart to one Don Gediman, an officer of Westinghouse, who advised Stewart that a W. J. Kelley[2] (hereinafter referred to as Kelley), Credit Manager of Westinghouse, was in charge of the Mojave account. On December 2, 1958, officers of Stewart talked, by long distance telephone, with Kelley and learned that Mojave owed Westinghouse, for material furnished on the Miramar Job, approximately $30,000.-00, which amount was due and unpaid and that Westinghouse was worried about the account. Kelley asked the aid of Stewart in seeing that Westinghouse was paid. Stewart offered to withhold the $50,000.00 payment about to be made to Mojave, or alternatively, to issue a check made jointly payable to Mojave and to Westinghouse. Kelley informed Stewart that this was not necessary and urged that the $50,000.00 payment be made directly to Mojave stating that he was satisfied that Mojave would then pay Westinghouse. Stewart did, that day, in reliance on Kelley's representations, make a payment to Mojave of $50,749.40. At the close of the above telephone conversation, of December 2, 1958, Stewart officials asked Kelley to verify, in writing, when payment was received by Westinghouse from Mojave and Kelley agreed to furnish a letter when payment was so received. Additionally, and during the same telephone conversation, Kelley was asked as to how Stewart should handle payments to Mojave in the future to insure that the materialman, Westinghouse, would be paid. Kelley advised the Stewart officials that Westinghouse would let Stewart know any time that Mojave failed to make payments satisfactory to Westinghouse. Kelley and the Stewart officials then arrived at an agreement that Westinghouse would advise Stewart any time Mojave was delinquent and that Stewart could rely on such notice and in the absence thereof could proceed to make future payments to Mojave.

Stewart heard no more from Westinghouse for ten days regarding the confirmation of payment by Mojave to Westinghouse, so another telephone inquiry was initiated by Stewart on December 12, 1958. This time the Westinghouse contact was Don Gediman who promised "action". As a consequence of this second phone call, a letter, dated December 15, 1958, was received by Stewart

---

1. Named as a party below, but not a party to this appeal.

2. W. J. Kelley died in the spring of 1962, prior to the trial.

from Kelley as Credit Manager of Westinghouse.[3]

Thereafter regular payments were made by Stewart to Mojave, totalling some additional $78,000.00, in round figures, the final payment being made in July, 1959. Mojave made no payment to Westinghouse on the Miramar Job from October 29, 1958 until October 27, 1959. Mojave became bankrupt and failed to pay Westinghouse the total amount due for materials furnished. No notice of any delinquency by Mojave on its obligation to Westinghouse was communicated to Stewart after the letter of December 15, 1958, until September 18, 1959, when a formal notice as required by the Miller Act was served by mail on Stewart. This notice showed a materialman's claim in favor of Westinghouse for balance of purchase price of material furnished Mojave in the sum of $79,000.00.

Stewart officials testified they relied on Kelley's promise to give notice of any failure on the part of Mojave to pay for materials and that the subsequent payments made to Mojave were based on such reliance.

Appellant brought suit as use plaintiff under the Miller Act against Stewart, as prime contractor, against Mojave, as subcontractor, and against Amsterdam, as surety. Appellees defended with denials and an affirmative defense of estoppel. The primary issue presented on this appeal arises out of the defense of estoppel successfully advanced by the appellees. The defense, simply stated, was an attempt to establish that Westinghouse promised to advise Stewart if Mojave failed to pay for material and that the appellants failed to do so and Stewart paid Mojave in reliance on the promise, to Stewart's detriment. The jury apparently accepted the evidence of the appellees on this point and found both specifically and by implication that the estoppel was established. Whether an estoppel is present is a question of fact. Quon v. Niagara Fire Insurance Co., (C. A. 9, 1951) 190 F.2d 257. Substantial evidence exists to support the jury finding. Consequently we may not substitute our judgment for that of the jury. Lyons v. Gilliland, (C.A. 9, 1962) 303 F.2d 452, cert. denied 371 U.S. 923, 83 S.Ct. 291, 9 L.Ed.2d 231.

But appellant asserts that the defense of estoppel will not lie in a Miller Act case in any event. As appellant perceives the law, a material supplier to a subcontractor, having no direct contractual connection with the prime contractor, is completely protected by giving the 90-day notice required under the Act, regardless of other conduct. It is argued that to require the giving of other notice, or be estopped for failure to do so, would be in contradiction of the envisioned congressional policy in enacting the Miller Act. Appellant cites no authority for this position. Our research discloses that the defense of estoppel has been frequently and successfully raised under comparable factual situations in Miller Act litigation. Moyer v. United States (C.A. 4th, 1953) 206 F.2d

3. "WESTINGHOUSE
Electric Supply Company
905 East Second Street
Los Angeles 12, Calif.
MAdison 9–4161
December 15, 1958
James Stuart Company
Box 211
Phoenix, Arizona
Attn: Mr. A. C. Klotz
Gentlemen:
In line with your recent conversation with Mr. Gediman of our sales department and with the knowledge and consent of Mojave Electric Company, we wish to advise that as of November 30th, their indebtedness to us on the Training Building at Mira Mar, California, was $26,900, of which part represented charges made in October and the remainder being made in November.
We wish to further advise that payments on this account have been made to us as agreed.
Very truly yours,
WESTINGHOUSE ELECTRIC
SUPPLY COMPANY
/s/ W. J. Kelly
WJK:eb      Credit Manager"

57; 39 A.L.R.2d 1098 (Annotated). We hold that in a proper case a materialman to a subcontractor in a Miller Act case may so conduct himself as to be estopped to claim the protection of the Act.

Appellant has a second string to this bow and contends that, as to the surety, at least, the defense of estoppel is not available. Reliance is placed on the *Powers Regulator Company* case.[4] Powers was a State of California decision based on the California Public Works law.[5] The plaintiff therein, a material supplier to a sub-subcontractor, brought suit solely, against the surety, on the statutory public works bond. Plaintiff had given a release of claim running directly to the prime contractor; the prime contractor thereupon paid the subcontractor who paid the sub-subcontractor who failed to pay the plaintiff. In construing the California law the court held that the statutory bond did not create a principal and surety relationship between the bonding company and the prime contractor, and that the prime contractor was not liable as a principal on the bond.[6] Since there was not a principal-surety relationship, and since the bonding company had a "primary" obligation, rather than a surety or guarantee type of obligation, the act of the plaintiff in furnishing a release to the prime contractor was then held not to work an estoppel which could be raised as a defense by the surety.

The instant case is therefore readily distinguishable. Clearly the Miller Act payment bond scheme is a suretyship arrangement. The contractor is primarily liable.[7]

"Certainly Congress intended by passing the Miller Act to afford subcontractors and *materialmen*, no doubt in substitution for the mechanic's liens generally available against private property owners, a liberal remedy against the *general contractor*. But the provision for notice indicates that Congress did not intend to strip the prime contractor, who is *primarily liable*, of all protection." (Emphasis supplied) United States v. Praught (C. A. 1st, 1959) 270 F.2d 235 at 237, 238.

Stewart, the prime contractor, was named as a defendant and the plaintiff's allegation in its complaint recites that Stewart and the surety were bound on the bond "jointly and severally". In the prayer for relief judgment is sought against Stewart and the surety, "and each of them". *Powers* is not in point here. The defense of estoppel was available to the appellees and the court did not err in submitting the issue to the jury.

Appellant presents a number of other specifications of error regarding the giving or failure to give certain specified instructions. Upon the reading of all the instructions, we are persuaded that the jury was fully, fairly and properly instructed and that no error is shown in the record in this regard.

Appellant further cites as error the practice adopted by the trial judge in

---

4. Powers Regulator Co. v. Seaboard Surety Co., 204 Cal.App.2d 338, 22 Cal.Rptr. 373.

5. West's Ann.Gov.Code, § 4200 et seq.

6. "Counsel for respondent stress the first paragraph of the instant undertaking which purports to bind Allison Honer (prime contractor) as a principal and they refuse to recognize the limitation contained in the condition of the bond —that the surety will pay, not that the 'principal' will pay. This is the same limitation which is expressed in § 4204. This bond is given for the benefit of persons with whom the general contractor has no contractual relationship (except the first subcontractor, Clark Company). The reason is plain. All moneys agreed to be paid to the subcontractor are intended and agreed to cover all labor and materials furnished by or for him upon his part of the work; he is to pay for the same; and there is neither legal nor moral obligation upon the general contractor to do so." Powers Regulator, supra, 22 Cal.Rptr. 373 at 379.

7. See U. S. Standard Form No. 25A, Payment Bond (Construction) 41 U.S. C.A.App. § 54.16.

advising counsel of the instructions he proposed to give. Nothing in the record supports the statements made in appellant's brief on this point.

Error is predicated on a purported failure by the trial judge to give appellant an opportunity to object to instructions as given by the court in accordance with Rule 51 of the Federal Rules of Civil Procedure. Contrary to the contention of the appellant, the record shows that such opportunity was given, that appellant sought successfully to have additional instructions given, and that no objection to the procedure followed was made by the appellant at the time.

We have examined the other specifications of error and find no merit in them.

There being no demonstrable error in the record, and the verdict of the jury being based on substantial evidence, the judgment thereon is affirmed.

