358 F.2d 508
 The UNITED STATES of America, for the Use of J. W. BRIGGS, Appellant and Cross-Appellee,
v.
Floyd R. GRUBB, United Pacific Insurance Company, a corporation, First Doe, Second Doe, Third Doe, Black Corporation, White Corporation, Blue Co., a partnership, and Gray Co., a partnership, Appellees and Cross-Appellants.
 No. 19337.
 United States Court of Appeals Ninth Circuit.
 March 15, 1966.
 
 COPYRIGHT MATERIAL OMITTED Laurence W. Carr, Redding, Cal., Gardiner Johnson, Thomas E. Stanton, Jr., San Francisco, Cal., Carr & Kennedy, Redding, Cal., Johnson & Stanton, San Francisco, Cal., for appellant.
 Harold J. Chase, of Maloney, Chase, Fisher & Hurst, San Francisco, Cal., for appellees.
 Before BARNES, HAMLIN and JERTBERG, Circuit Judges.
 BARNES, Circuit Judge:
 
 
 1
 This is an appeal and cross-appeal from a judgment of the United States District Court for the Northern District of California, Northern Division. The district court had jurisdiction pursuant to the terms of the Miller Act, 40 U.S.C. §§ 270a-270d. This court has jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 2
 In June 1959, Floyd R. Grubb was the successful bidder for a contract with the Bureau of Reclamation for the relocation of a road in connection with the Trinity Dam project being conducted by the Bureau in Northern California. On July 10, 1959, Grubb executed a performance bond and a payment bond with United Pacific Insurance Company, as required by the Miller Act. Pursuant to the requirements of the Miller Act, the performance bond guaranteed that Grubb would properly perform his contract with the Bureau of Reclamation, and the payment bond guaranteed that Grubb would make prompt payment to all persons supplying labor and material in the prosecution of the construction contract.
 
 
 3
 Grubb was an Oregon contractor and had never undertaken a California job, nor a job as large as his Trinity Dam contract. Although he began work on the contract near the beginning of July, 1959, he had made very little progress by the end of August 1959. As a result, Grubb sought assistance from J. W. Briggs, a contractor with offices in Redding, California, who had been an unsuccessful bidder on the same Trinity Dam road contract. Several meetings were held between the two contractors in August and early September 1959, the most definite result of which was that Grubb refused an offer from Briggs to subcontract part of the job to Briggs at a price of forty cents per yard. The parties finally reached an agreement, the significance of which is disputed in this litigation, which was incorporated into two documents under dates of September 3 and September 17, 1959 (Exhibits 4 and 5). By the September 3, 1959 agreement Briggs had assumed for all practical purposes the entire management of the job. He subsequently transferred Grubb's employees to his (Briggs') own payroll, took over receiving and paying for most of the labor and materials used on the job, and assumed full management of the job. The September 17, 1959 agreement provided that Grubb would pay $10,000 to the Hardesty Construction Company, a firm entirely owned by Briggs. Briggs contends that the $10,000 agreement represented a fixed fee for the performance of his services and that it was paid to the Hardesty Company for tax reasons. The terms of the September 3, 1959 agreement and the evidence adduced at the trial indicate, however, that further compensation for Briggs was contemplated.
 
 
 4
 At the time of his September 1959 agreements with Briggs, Grubb was in serious financial difficulty. At the time he undertook the Trinity Dam road contract Grubb was completing another contract in Ashland, Oregon, bonded by the Peerless Casualty Company on which he suffered a loss, and had other obligations coming due during the course of the Trinity project. In September, 1959 Grubb entered into an arrangement with the Bank of America by the terms of which the bank advanced him $50,000 secured by the monthly progress payments from the Bureau of Reclamation. Loans of $50,000 were made and repaid on three occasions between September and December 1959. United Pacific alleges that Briggs knew of these loans, but Briggs denies such knowledge.
 
 
 5
 After the agreements of September 1959 between Briggs and Grubb, and after Briggs had assumed virtually complete control of the construction project, the work progressed rapidly. Large progress payments were paid by the Bureau of Reclamation on the contract from September-January, 1959-1960. According to Grubb's testimony, Grubb supplied copies of the progress payments to Briggs as they came due. Grubb did not pay over the full amount of the progress payments to Briggs, however, but instead diverted a portion of each such payment to the satisfaction of bills on other unrelated jobs. Furthermore, while Briggs applied the portion of each progress payment turned over to him by Grubb to the payment of material and labor bills on the Trinity Dam job, and took assignments of the Miller Act claims from each laborer and materialman, a number of materials accounts were left in the hands of Grubb for payment and were not paid. United Pacific alleges that all of this was done with the full knowledge of Briggs and with the purpose of allowing Grubb to bail himself out of his financial difficulties by diverting funds from the Trinity Dam project progress payments.
 
 
 6
 In early December 1959, Briggs notified United Pacific that Grubb had been borrowing money from the Bank of America on the strength of the progress payments from the Bureau of Reclamation. Briggs contends that this was the first notice he had had of Grubb's financial manipulations and that he notified the surety as soon as he learned of the bank loans. At this time Briggs held assignments from laborers and materialmen for $76,729.13 which he had paid and for which he had not yet been reimbursed by Grubb from the progress payments, and there were, in addition, between $100,000 and $150,000 worth of bills owing on the Trinity Dam job which Grubb had the responsibility to pay and had not yet paid. On December 15, 1959 United Pacific stepped in, and on December 22, 1959 the job was shut down temporarily due to weather conditions.
 
 
 7
 United Pacific took over the prosecution of the construction contract and received progress payments already accrued for adjustments and work performed in December 1959. These payments due at the time United Pacific took over totaled $86,322.91. United Pacific continued performance of the contract, using Grubb as job superintendent, and completed the job in September 1960. In October 1960 Grubb filed a petition in bankruptcy and was a bankrupt at the time of trial in this case. United Pacific paid all labor and material claims on the project, incurred both before and after it assumed management of the job, with the exception of Briggs' claims of $75,793.40.
 
 
 8
 On November 2, 1960, Briggs brought suit against United Pacific on the Miller Act payment bond, alleging two causes of action. First, to recover $75,793.40 due for labor and material supplied by Briggs pursuant to a subcontract between Briggs and Grubb. Second, to recover $67,455.22 as assignee of persons who had furnished labor or material used on the project. On March 16, 1961 United Pacific filed a cross-complaint stating two causes of action. First, that Briggs had become a partner or joint-venturer and had assumed the obligations of a principal under the bond and was liable to the surety for more than $200,000, the cost of completing the contract. Second, on the theory that negligent conduct by Briggs had substantially damaged the surety. The cross-complaint was stricken on motion. In a pre-trial stipulation it was agreed that the labor and materials for which recovery was sought had been used in and contributed to the contract.
 
 
 9
 On August 2, 1963 the district court filed a memorandum and order stating its decision in favor of United Pacific. In this memorandum Judge Halbert stated that he did not believe the testimony of Briggs and Grubb and would base no findings on that testimony. He then stated that "For the record, I will find that Briggs was not a subcontractor of the prime contractor, Grubb, and that the attempt to take assignments from the laborers and the material-men was a sham transaction, used solely to do by the back door that which Briggs and Grubb knew they could not do by the front door" (C. T. pp. 194-5). He directed United Pacific's counsel to prepare findings of fact and conclusions of law. United Pacific submitted proposed findings and conclusions, which Briggs contended went beyond the direction given by the district court on August 2, 1963. Briggs moved for a hearing on settlement of the findings, which was denied. On December 18, 1963 the district court signed the findings and conclusions prepared by United Pacific, which directed a judgment in favor of Grubb on his personal liability as well as entering judgment for United Pacific on the complaint and for Briggs on the cross-complaint.
 
 
 10
 Briggs moved for a new trial, which was denied on February 20, 1964. This appeal by Briggs and cross-appeal by United Pacific followed.
 
 I — Sub-Contract or Joint Venture?
 
 11
 Appellant prosecutes this appeal on the theory that if he contributed labor or materials used on the Trinity Dam contract, or paid for such labor or materials, he is entitled to recover against the surety on the payment bond pursuant to the terms of the Miller Act. This theory is merely a repetition on appeal of the argument upon which appellant's action in the district court was based. It attempts to ignore the findings and conclusions of the district court, and the legal status of the appellant which the district court found, i. e., that he was a joint venturer.
 
 
 12
 While a Miller Act payment bond does make the surety liable for labor and materials furnished by a subcontractor when the contractor under the bond defaults, such a bond does not make the surety liable for monies expended on the contract by a partner or joint venturer of the contractor under the bond. This principle has been settled by cases interpreting the coverage of the Miller Act and its statutory predecessor, the Heard Act. Hardaway v. National Surety Co., 211 U.S. 552, 29 S.Ct. 202, 53 L. Ed. 321 (1909); St. Paul-Mercury Indemnity Company v. United States, 238 F.2d 917 (10th Cir. 1956); United States v. United States Fidelity & Guaranty Co., 4 F.Supp. 854 (D.Wyo.1933); National State Bank of Newark v. Terminal Const. Corp., 217 F.Supp. 341 (D.N.J.1963).
 
 
 13
 The district court found and concluded that Briggs was not a subcontractor, but had taken on the legal status of a joint venturer or partner. The only determination to be made on appeal on this issue, therefore, is whether or not such findings are clearly erroneous, since if they are not the denial of liability follows from the established case law involving joint venturers.
 
 
 14
 We have examined the testimony and exhibits introduced before the district court and are unable to conclude that the district court erred in discounting the testimony of Briggs and Grubb or that the findings, largely based on other evidence, are clearly erroneous. We believe that the nature of the September 3 and 17, 1959 agreements between Briggs and Grubb and the conduct of the parties which followed those agreements, including the assumption by Briggs of the payroll and disbursements; the approval of all bills by Briggs; the choice of subcontractors by Briggs; the failure to register Briggs as a subcontractor with the Bureau of Reclamation until January 1960; the knowledge of Briggs as to the diversion of funds from the job by Grubb; and the notice which Briggs had from Grubb's financial statements of the loans to Grubb from the Bank of America, all support the findings of the district court. These same findings also support the denial of recovery to Briggs as an assignee of laborers and materialmen, since as a joint venturer he was obligated as a principal to pay these claims and does not thereby assume the status of a laborer or materialman himself within the meaning of the Miller Act. We cannot hold any of these findings erroneous as a matter of law.
 
 II — Estoppel.
 
 15
 The district court also made findings and conclusions to the effect that Briggs was estopped by his conduct to claim under the bond, and had exonerated the surety. These findings seem to be an alternative ground for the denial of recovery to Briggs, based on the premise that even if he had established that he was a subcontractor he still could not recover. In view of our conclusion as to the existence of a joint venture, we need not go into this aspect of the case at any length. The primary basis for the alleged estoppel and exoneration was Briggs' participation and acquiescence in the diversion by Grubb of parts of the progress payments. Briggs challenges the findings on this issue by contending that the progress payments became the property of Grubb and he (Grubb) was under no obligation to devote them exclusively to the Trinity project, and further that no basis for estopping Briggs to claim as a subcontractor can be founded on Grubb's diversion.
 
 
 16
 First, the position of appellant that Grubb had no duty to the surety to apply the progress payments to the contract guaranteed by the surety is impossible to support. While we do not dispute that a contractor can do as he pleases with particular progress payments as long as he is financially able to complete the contract, he cannot divert funds on a bonded job to the detriment of the surety. The cases have long so held. Columbia Digger Co. v. Sparks, 227 F. 780 (9th Cir. 1915); United States for Use and Benefit of Crane Co. v. Johnson, Smathers & Rollins, 67 F.2d 121 (4th Cir. 1933); Town of River Junction v. Maryland Casualty Co., 110 F.2d 278 (5th Cir. 1940); R. P. Farnsworth & Co. v. Electrical Supply Co., 112 F.2d 150 (5th Cir. 1940).
 
 
 17
 Second, appellee asserts that conduct by a creditor in relation to his principal which results in prejudice to the surety will bar the creditor from claiming against the surety to the extent of the prejudice caused by his conduct. This principle is suggested in American Auto Insurance Co. v. United States, 269 F.2d 406, 410 (1st Cir. 1959) and in Piel Const. Co. v. Commonwealth of Pennsylvania, 35 F.2d 265 (3rd Cir. 1929). However, assuming for this alternative basis of decision that Briggs was not a joint venturer or partner, we do not find this principle to be applicable here because there is no showing that Briggs was under any obligation to keep the surety informed of the use to which Grubb was directing the progress payments. The findings on this point (Findings of Fact Nos. 27, 32, 33, 34, 38, 39, 40, 41, 42, 43; C.T. pp. 222-27) do not establish such an obligation when taken as an alternative to the joint venture theory of bar to recovery. In the Piel case, supra, prejudice to the surety was found in the creditor's failure to enforce the terms of its contract with the prime contractor who was the insured party. A similar basis of prejudice was discussed but found not to be supported by the evidence in the American Auto Insurance Co. case, supra.
 
 
 18
 Nor do we find determinative appellee's authority for estoppel as a factual question, as an alternative to the joint venture theory of bar to recovery. In the case of United States for Use and Benefit of Noland Co. v. Wood, 99 F.2d 80 (4th Cir. 1938) the court held the creditor estopped to claim under the surety bond because it had contracted to limit its claim to those which it could assert against the debtor under its contract. In United States ex rel. Westinghouse Electric v. James Stewart Company, 336 F.2d 777 (9th Cir. 1964), the creditor was estopped by its failure to notify the prime contractor of failure of the subcontractor to make payment, as the creditor had specifically promised to do. In Moyer v. United States, 206 F.2d 57 (4th Cir. 1953) the court declined to find an estoppel in the absence of false statements by the creditor upon which the prime contractor or surety relied to their detriment. Thus, though some of these cases do hold that the applicability of the doctrine of equitable estoppel is a fact question, they also demonstrate that the doctrine has only been applied where the party estopped has failed to perform an affirmative duty or has misled the principal when it had a duty to speak. The facts of the case presently before the court are distinguishable.
 
 
 19
 We hold that the findings of fact do not support estoppel or exoneration as an alternative ground for denying recovery to Briggs.
 
 III — Personal Non-Liability of Grubb.
 
 20
 The district court made findings of fact that Grubb had never made any personal promise to pay Briggs for labor and materials, and that Briggs was to look only to the progress payments (finding 16, C.T. p. 219); that Briggs intended to secure a portion of the expected profit on the prime contract in addition to the amount to which he was entitled under the September 3, 1959 agreement with Grubb (finding 35, C.T. p. 225); that Briggs had control of the prime contract and was "jointly interested with Grubb in its completion and performance and in the profits, if any thereof" (finding 36, C.T. p. 225); and that Grubb did not personally owe Briggs any amount (negative findings 3 and 7, C.T. p. 227). The district court then made conclusions of law that Grubb owed Briggs nothing and was entitled to judgment in his favor (conclusions 6 and 13, C.T. pp. 229, 231).
 
 
 21
 Appellant attacks the district court's holding of personal non-liability on the part of Grubb by attacking finding 16, supra. He cites the testimony of Grubb to the effect that Grubb had made personal payments to Briggs on three occasions and that he personally owed Briggs the amount involved in this litigation. (Appellant's Brf. pp. 71-73.) But the trial court did not believe Grubb. Appellee defends the propriety of the district court's finding of nonliability on the part of Grubb without making any references to the record to support its statements. (Appellee's Brf. p. 85.)
 
 
 22
 We have considered the possibility that the court's holding as to Grubb was based on the premise that the contract between Grubb and the Hardesty Construction Company dated September 17, 1959, providing for a fixed fee of $10,000 for Briggs' services (Pl. Ex. 5), fixed the limit of Grubb's personal liability, and that the contractual liability had been paid or was discharged. The court also found that Briggs was jointly interested with Grubb in the performance completion, and profits from the contract and that Briggs had control of the prime contract and looked to the progress payments for his compensation, yet he permitted Grubb to divert progress payments to his personal use, this seems more consistent with a theory that Briggs believed he had a claim upon Grubb personally after he had allowed Grubb to bail himself out of his financial difficulties with the progress payments than with a premise that Briggs' claim against Grubb was limited to the Hardesty contract. We have also considered the possibilities that the district court's holding of personal nonliability on the part of Grubb was based on a lack of showing of proper service in this action upon Grubb (as suggested by Appellee's Brf., p. 85), or on a theory that Briggs had estopped himself to claim against Grubb personally by permitting Grubb to divert the progress payments to his (Briggs') detriment.
 
 
 23
 Yet we think that the finding that Briggs was not a subcontractor but was in fact a joint venturer, clearly and necessarily implies that Briggs was to get his money out of the job and that Grubb had not promised to pay Briggs. Hence we affirm Grubb's personal nonliability.
 
 IV — United Pacific's Cross-Complaint.
 
 24
 In answer to Briggs' complaint, appellee United Pacific filed not only an answer but a cross-complaint. The cross-complaint was stated in two causes of action, the first of which alleged that Briggs was guilty of either negligent or intentional diversion of money equitably belonging to United Pacific, and the second alleging that by his agreement with Grubb, Briggs became a principal with Grubb under the performance bond.
 
 
 25
 In the memorandum and order of January 11, 1962, the district court dismissed the cross-complaint of United Pacific against Briggs. (C.T. pp. 21-29.) In dismissing the cross-complaint the district court correctly recognized that a motion to dismiss can be granted only if it is certain that the cross-complaint fails to make apparent a right to recover on any set of facts which might be proven under it (citing Asher v. Ruppa, 173 F.2d 10 (7th Cir. 1949)). The district court further correctly recognized that on a cross-complaint under a Miller Act bond, local rather than federal law is applicable (citing Continental Casualty Co. v. Schaefer, 173 F.2d 5 (9th Cir. 1949)), and agreed that the case of Goerig v. Continental Casualty Co., 167 F.2d 930 (9th Cir. 1948), holding that a partner or joint-venturer of a government contract holder subject to a Miller Act bond could be sued by the surety in the case of default, was applicable. But the district court dismissed the cross-complaint because of its belief that the action was governed by that portion of the California Statute of Frauds, California Civil Code § 1624(2), requiring a special promise to answer for the debt, default, or miscarriage of another to be in writing, and no such writing had been alleged in the cross-complaint. The district court supported this line of reasoning by citation of Griffin v. Williamson, 137 Cal.App.2d 308, 290 P.2d 361 (1955), holding that a person forming a partnership with another does not thereby become liable for the pre-existing debts of the other.
 
 
 26
 We believe that the district court was correct in dismissing the cross-complaint on this ground. The district court took the position that when Grubb alone first obtained the Miller Act bond from United Pacific, he created an obligation upon himself to complete the contract and hold the surety harmless. The question presented by the factual situation here present is the effect of Briggs' agreement to become a joint venturer and a principal under the surety bond as alleged by United Pacific and found by the court. Did Briggs become obligated in direct contractual relationship with United Pacific, so as to by-pass the Statute of Frauds, when he entered into the joint venture agreement with Grubb?
 
 
 27
 We note first that United Pacific is correct in stating that its cross-complaint did not allege that Briggs had undertaken "to answer for the debt, default, or miscarriage" of Grubb by entering into the joint venture agreement. United Pacific asserts in its cross-complaint allegation, that by entering into a joint venture Briggs became a principal on the bon whom United Pacific could hold in the event of default — that this establishes the basis for liability on the part of Briggs under the bond.
 
 
 28
 We cannot agree with the analysis suggested by United Pacific.
 
 
 29
 Turning to the joint venture agreement between Briggs and Grubb, it can be seen that any liability under the bond on the part of Briggs would have to flow from his assumption of some or all of the liability of Grubb, since Grubb was the only party obligated to United Pacific under the bond as originally written. It is true that section 2794 of the California Civil Code establishes the rule that the Statute of Frauds is not applicable in cases of original, as opposed to collateral, promises to answer for another's debt. But all of the cases which we have discovered dealing with the distinction between original and collateral promises have been situations where the new promise of the third party (here Briggs) to answer or be liable for the debt or default of another (here Grubb) stated explicitly just what debt or obligation of the original promisor was being assumed by the third party. Cf. Parrish v. Greco, 118 Cal.App.2d 556, 258 P.2d 566 (1953); California Viking Sprinkler Co. v. Pacific Indem. Co., 213 Cal.App.2d 844, 29 Cal. Rptr. 194 (1963); Beeson v. Wright, 159 Cal. 133, 112 P. 1091 (1911). In this case there is neither an allegation in the cross-complaint nor evidence in the record that Briggs ever entered into any contract with Grubb regarding the surety bond, or that United Pacific even knew of Briggs' participation as a joint venturer until it received notice of Grubb's default.
 
 
 30
 Since Briggs did not enter into any explicit oral or written contractual relationship with Grubb or any direct contractual relationship under the bond with United Pacific that would constitute an "original" promise outside the Statute of Frauds, any liability under the bond on the part of Briggs would have to arise from his joint venture arrangement with Grubb. Unless it were an "original" promise, an assumption of liability by Briggs when (and if) he became a principal with Grubb would constitute a "promise to answer for the debt, default, or miscarriage of another" and thus would have to be explicitly assumed in writing to meet the requirement of the California Statute of Frauds. As the district court pointed out, the cross-complaint alleged no such writing. Further, under the case of Griffin v. Williamson, supra, Briggs as a partner of Grubb would not become liable for the pre-existing debts or obligations of Grubb without having expressly assumed such liability. We conclude that the California Statute of Frauds is a good defense to the cross-complaint and that the district court was correct in its dismissal of the cross-complaint.
 
 V — Preparation of the Findings of Fact.
 
 31
 Appellants asserts that he has been prejudiced by the action of the district court in discrediting the testimony of Briggs and Grubb and by turning the preparation of the findings over to the appellee with minimal directions. In view of these allegations we have scrutinized the record for ourselves. We cannot agree that appellant has been prejudiced by the district court's expressed attitude toward the testimony of Briggs and Grubb for, as we found in point I, supra, the findings of joint venture to which the court's comments are principally directed are supported by the record. Other than as hereinabove mentioned, we are satisfied that the findings are supported by ample evidence.
 
 
 32
 Affirmed.